Case number three for argument today is United States v. Norton. Mr. Teel, if you will wait a few minutes. I'm sure if the people in the audience had read your brief they would be staying. I'm glad at least one of us thinks that, Your Honor. They're all too young to be retiring. Okay, I think it's quieted down. Mr. Teel. Thank you, Your Honors, and may it please the Court. The appeal that we have today arose from a six-day jury trial as well as a two-day suppression hearing. There were at least two issues that were raised in our briefs. I'd like to focus today, if it pleases the Court, on the one clean legal issue that is presented in the briefs, and that being whether this Court's holding in the United States v. Williams, which extended Wren into the collective knowledge doctrine, is good law and should continue to be followed. It is Norton's position here that Williams and its incorporation of Wren to say that the subjective intent of an officer is unimportant for a probable cause determination should stay where it is in Wren, and that being the one officer making an arrest based upon probable cause that he himself has developed. It should not be extended into the collective knowledge doctrine as announced by this Court, announced by the Supreme Court in Hensley, and then expanded. Well, counsel, I notice your brief doesn't discuss Devenpeck against Alford, but I have a lot of trouble understanding Devenpeck as saying anything other than that as an objective matter, if the police force has probable cause. It just doesn't matter what the officer making the arrest knew or thought or cared, or what crime he was pursuing. Devenpeck says it just doesn't matter. It sounds like you're asking us to disagree with the Supreme Court. Well, if that's the case, Your Honor, then we have to disagree with the Supreme Court in Hensley, and we have to then disagree with this Court's incorporation of Hensley, then in NAFSCR and its other cases where we say, or where this Court has said, that objective reliance on the part of the arresting officer is, in fact, the very first test that we, or the very first element of the test. Devenpeck said that's not the correct standard. Devenpeck said if you arrest explicitly for crime A and you say, this is what I'm doing, I'm arresting for crime A, if there is probable cause to arrest for crime B and no probable cause to arrest for crime A, that arrest is valid. That's the holding of Devenpeck. Well, then again, I mean, then I must say, Your Honor, that there is a whole body of Seventh Circuit law that needs to be specifically addressed.  It was disapproved in Devenpeck. Well, then perhaps my entire, perhaps I should just abandon this argument in a hole. I guess what I would say, Your Honor, though, is that NAFSCR and its progeny are still relied upon by both the government and defendants in this circuit regularly. They, in fact, were relied upon by the district court in this case. And so if it is the case here that this circuit is no longer going to adopt that test or no longer to apply that test, then it needs to be very specifically stated. Because the courts of this circuit still apply NAFSCR. They still apply the three-pronged test that it announces. And it still applies this objective reliance test, albeit inconsistently. In fact, this court applied it as recently as 2015 in the Sands case. So it's not a situation where this has ever, at least in this circuit, has been expressly disapproved of or not followed. In fact, as I said, within at least the last two and a half years, even this court has applied that test to a collective knowledge case. And so, again, if that is to be the ruling, then I guess I would ask for the purposes of the court and for the purposes of the practitioners below that we just simply say that, that NAFSCR and its three-pronged test are no longer the law. Because as I said, the district court here relied on it. The government here relied upon it. Mr. Norton relied upon it. It is the law that is relied upon by the courts below. I'm happy to take any questions on that. I understand that Justice Judge Easterbrook likely does not have any based upon his comments. And I don't want to go any further into it. If there is just simply a wholesale, I suppose, repudiation of the argument, I don't want to waste the court's time any longer than necessary. So if there are questions, I'm happy to answer them. If not, I'm happy to reserve the rest of the time for Rolando. Certainly, counsel. Thank you. Mr. Whalen. May it please the Court. Good morning, Your Honor. Nathaniel Whalen here on behalf of the United States of America. Your Honors don't need to get to the collective knowledge doctrine. The first issue is whether the district court clearly erred in relying on Officer Schultz's testimony that Norton was speeding. It sounds like there's no real dispute as to that at this point. Officer Schultz has his radar gun. He clocks Norton going 72 in a 70-mile-per-hour zone. That gives him probable cause to pull over Norton. That testimony wasn't contrary to the laws of nature. It shouldn't leave this court with a firm and definite conviction that the district court erred. Once you get that 72 in the 70-mile-per-hour zone, that's probable cause. The stop's valid. Everything that happens after that is permissible under the Fourth Amendment since there's no challenge beyond that. In terms of, I guess, Mr. Norton's second argument on appeals, it relates to the transcript. Given that that hasn't been raised in oral arguments, and we think it's pretty clear that none of the confidential sources statements were being offered for the truth of the matter asserted, Mr. Norton hasn't pointed to a single statement that was being offered for the truth of the matter asserted. We would rest on our brief unless this court- Unhelpful. Well, this is for context. If I were a juror, I would have no clue what that meant. Right? I could imagine an instruction that says something like, look, you've heard the statements from the informant. You can't consider them for their truth, but you can consider them because what other people are saying, the meaning of what other people are saying may depend on what this is. The conversation, I'll meet you at 5 o'clock at the corner, followed by yes. Without the first, you can't understand the second. The jury could be told that in a straightforward way, could it not? It could, Your Honor. And what the defense counsel- So my question is, did anybody ask? No one asked for that, Your Honor. What defense counsel, the government, and the court agreed upon was that the court would be told the confidential sources statements were not being offered for the truth of the matter asserted. It did tell the jury that the co-conspirator statements were being offered for the truth of the matter, but there was no instruction given along the lines Your Honor just said, other than being told it wasn't being offered for the truth of the matter asserted. Unless this court has any questions on anything really in our briefs, otherwise we would rest on our briefs and ask that this court affirm. Are there mixed signals that need to be cleared up by this court on collective knowledge? Your Honor, we didn't rely on the case Judge Easterbrook brought up, and so truthfully, I'm not able to give any guidance to the court on that fact. I must say, almost nobody ever does. It's one of the most ignored, important, unanimous decisions of the Supreme Court in the last 20 years. And I apologize for that, Your Honor. But what I would say is even under the three-part test set forth in cases like Williams, this case fact pattern falls squarely within that. Right, but as an experienced practitioner, I'm asking if there's confusion in the district courts about the meaning of the collective knowledge doctrine and how it applies. Your Honor, it's been my experience that it actually hasn't been brought up all that much. I understand that's not really the answer to Your Honor's question in terms of whether there's confusion. But this is not the case to clear it up since we have another basis, the 72 and the 70? I think this is not a case where the court has to reach that issue because of the 72 and the 70. That's right, Your Honor. So unless this court has any further questions, we would ask that you affirm for the reasons stated in our briefs. Thank you. Thank you. Anything further, Mr. Teague? Oh, dear. Sorry. The podium has a mind of its own. It is the age-old trick to move the podium on before rebuttal. Thank you, Your Honor. Just briefly to address the two points that were brought up by Mr. Whelan, first the 72 in the 70 issue. As we've said in our briefs, frankly, we don't believe that this court needs to give the district court determination of the 72 deference because ultimately what the district court did was not make a credibility determination. She just simply ignored all of the evidence to the contrary. The way the 72 was developed is frankly a bit more complicated than what Mr. Whelan would say. As we see from the record, there was another DEH, an agent Robertson, that employed a technique that he refers to as pacing where he tries to drive at approximately the same speed as the other vehicle and then look down at his speedometer and make some sort of estimate as to the speed. Of course, he testified at the suppression hearing that that method is not all that accurate, given the darkness that he was experiencing on that day. This was in November. It was very early in the morning. But he determines the speed to be between 70 and 75, of course, 70 being within the speed limit that the district court has determined existed. What Officer Schultz then says to the court is that I confirmed the prior reading of 72. Of course, the problem with that is there is no prior reading of 72 to confirm. So his testimony essentially postulates a set of facts which did not exist. So he then says, well, I then confirmed the 72, which didn't exist, with my radar equipment, but I'm not going to provide any evidence of that radar equipment to the court. And indeed, I'm not going to then issue a citation to Mr. Norton for driving the 72 in the 70. So what we would submit to your honors is that the district court did not make, what the district court did not say is that I find him to be credible. What she essentially did was just simply ignore everything else and simply accept the testimony despite all of the evidence to the contrary that's in the record. So that's, frankly, how you'll- What was all the evidence to the contrary other than the DEH? Well, it's the DEH and Schultz's own testimony. I mean, when Schultz tells the court that I confirmed the prior reading of 72, this necessarily postulates that there was a prior reading of 72 to confirm. That reading doesn't exist. Agent Robertson never testified that he had a reading of 72. In fact, he couldn't given the technique that he was using, this pacing technique. His testimony was on the low end, he's driving the speed limit. On the high end, he's driving five over. But there was never any testimony from Agent Robertson. So we're talking about a DEA agent and a state trooper who makes those kind of stops. That's correct. But, again, if the state trooper's testimony is to be credited that he was confirming a prior reading, then the question, I guess, from Norton's standpoint is where is this prior reading? Why isn't that prior reading anywhere in the evidence? And our submission is that there wasn't one, that what Agent Schultz actually did was to devise a speed which was minutely above the speed limit and then go with that. That is what we think the evidence shows. And it's certainly, there's no evidence to the contrary. As I said, there is no radar reading that was provided to the court. There was no citation that said 72 and 70. So that's, frankly, we believe that the court should frankly credit Robertson and then ultimately. . . What was the testimony and why he didn't want to provide the radar record? You'd have to ask the government, Your Honor. They simply didn't provide it at either of the two days of the suppression hearing. Did you ask him for it? I believe we did, yes. You believe you did or did you? Co-counsel was the one that conducted the suppression hearing. My recollection from reading the transcript, however, is that we did ask him and he just simply did not have it with him at court that day. Well, that doesn't mean it doesn't exist. Well, no, but again, this was a two-day suppression trial. I'd like to point that out, that there was an opportunity, certainly, between the conclusion of the first day and the beginning of the second day to go back into the records and find this reading and or find the citation for the 72, neither of which are before the court. But that doesn't mean it doesn't exist and that doesn't mean the officer was lying. I think it means for our purposes, though, in reviewing the record in front of us, that indeed it doesn't exist. I mean, if it's not in the record for the purposes of appeal, then frankly it's just as well as to not exist. Now, whether in an existential sense it exists or not, I suppose we could ask Officer Schultz. But I think from an appellate procedure standpoint, for the purposes of your honors in making the determination, I think we have to accept the fact that it doesn't exist because it was never offered by the government. And briefly with respect to the evidence with respect to the CHS's statements, the government has made this statement repeatedly that we've never identified a statement by the CHS that wasn't for the purpose of proving the matter asserted. That's not true. The CHS in this case made a number of statements that the government would then incorporate into its argument, most specifically the statements about the quality of this particular batch of heroin. This particular CHS was quite a fan of this batch of heroin, as demonstrated by the fact that he was actively using it during the times of the recording, and he made very complimentary statements about that heroin. This was ultimately then used by the government in its argument that these are high-level dealers, that they are bringing in the best of the best from Mexican cartels. So to say that all of these were just sort of chitter-chatter I think would be incorrect. Let me just sort of decide, when do we start using CHS rather than CI? Again, this is a question I think for the government. This was how they designated it. I am asking the wrong person. Yeah, and that is how I have seen it as well. Certainly in Indiana state proceedings we use CI. CHS appears to be the preferred. Maybe it's just this United States attorney. But I think Judge Easterbrook's question I think raises a good point, which is that, yes, the instruction that was given to the jury was relied upon and agreed to by both the defense and the government. But the reason for that is ultimately because it's the statement of this court from Schalk. The problem, of course, is that there is no case, at least in the Seventh Circuit, which describes what context means. If you look, you can start to sort of divine what it might mean from other cases, but none of those are really the case that we have in front of us. So you have a group of cases where you have a two-party telephone conversation, where they say, well, you need the testimony of the confidential informant to provide context because otherwise you have answers without questions and vice versa. That's obviously not what we have here, where we have a freewheeling discussion between up to a half a dozen different participants. We don't need the CHS's statements to sort of explain why what is being said is being said. The other way that it is described is simply to show that the discussion took place in the first place. It is essentially evidence that there was this conversation. Again, that is not what is implicated here because the government would eventually call at least two of the active participants in that conversation, that being Mr. Bates and Mr. Lefferts, as I recall. So neither of the explanations of context that are provided in at least the Federal Circuit case law seem to apply here. And that's why we would say that this is, in fact, not being used to provide context because there was no need to provide context to these statements. These were, in fact, provided to show the things that the government wanted to show, that being that Mr. Norton was a drug dealer, that he was coordinating the shipments, and that he was bringing in heroin of a high quality. That is why they were used. Harmless error? Excuse me? Harmless error? I don't think so, Your Honor, and here is why. That ultimately, if you look at the record in whole, there is very little reference to Mr. Norton doing a whole lot of anything, if you go throughout the six days of the trial. We have the conversation, the recorded conversation, where he appears to be an active participant in these deals, and then we have the $400,000 that is taken from his vehicle. That is essentially the entirety of the testimony that implicates Mr. Norton in doing a whole heck of a lot of anything. His flight? He did go to Mexico. I'm sorry, not Mexico, but Texas. I suppose there's a question of whether that was flight, but yes. I think the testimony was actually, I suppose, but I think that if you take those out, I think certainly the two strongest points that the government had, I think in this case, were the recording, where obviously he is participating in a discussion of how you deal drugs, how you make drugs, those sorts of things, and then finding $400,000 of illicit proceeds in the back of his truck are certainly far more indicative of guilt, perhaps, than a pleasure trip to Texas. So with that, Your Honor, I see that my time is nearing an end. If there are any additional questions, I'm happy to answer them. If not, I will cede the rest of my time and ask that Your Honors reverse the district court and remand this case for retrial. Thank you, Mr. Teel. Thank you, Your Honor. The case is taken under advisement.